## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PROLOGIC, INC.,
Dba Ultra Electronics ProLogic
9400 Innovation Drive
Manassas, VA 20110

                 Plaintiff,

v.

AQUARIAN SYSTEMS, INC.,
4603 Amherst Road
College Park, MD 20740,
(Prince George's County),

JASON BERNARD,
9147 Helaine Hamlet Way
Columbia, MD 21045,
(Howard County),

and

DANIEL SWINGLE,
29 Washington Lane, Apt. J
Westminster, MD 21157,
(Carroll County),

                 Defendants.

Civil Action No. _____

## <u>COMPLAINT</u>

This is an action by Prologic, Inc., dba Ultra Electronics ProLogic ("ProLogic") for (1)

breach of duty of loyalty against ProLogic former employees Jason Bernard and Daniel Swingle,

(2) breach of a confidentiality and non-disclosure agreement by Bernard, (3) breach of a

confidentiality, non-disclosure, and non-compete agreement by Swingle, (4) tortious interference

with prospective business advantage by Aquarian Systems, Inc. ("Aquarian") (a former

subcontractor of ProLogic), Bernard, and Swingle, and (5) misappropriation of trade secrets by Aquarian, Bernard, and Swingle.

### Parties

1.      Plaintiff ProLogic, Inc. is a registered West Virginia company with headquarters in Manassas, VA and offices in Fairmont, WV; Belle Vernon, PA; Colorado Springs, CO; Tampa, FL; and Westminster, MD.  ProLogic is a professional services and products firm.  ProLogic is the legal successor in interest to Scytale, Inc., which ProLogic purchased on October 16, 2009.  Scytale merged into ProLogic on December 30, 2011.

2.      Defendant Aquarian Systems, Inc. is a registered Maryland corporation with its principal place of business in Maryland.

3.      Defendant Jason Bernard is a former employee of ProLogic and a current employee of Aquarian.  Bernard worked at ProLogic from September 28, 2009 through June 30, 2014.  Bernard resides at 9147 Helaine Hamlet Way, Columbia, MD 21045.

4.      Defendant Daniel Swingle is a former employee of ProLogic and a current employee of Aquarian.  Swingle worked at ProLogic from April 6, 2009 through June 30, 2014.  Swingle resides at 29 Washington Lane, Apt. J, Westminster, MD 21157.

### Jurisdiction

5.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the action is between citizens of different states and the amount in controversy exceeds $75,000.

### Venue

6.      Venue is proper in this district under 28 U.S.C § 1391(b).

**Factual Background**

7.      ProLogic is a professional services and products firm that specializes in providing innovative, mission-critical technology solutions to the Department of Defense, Department of Justice, Department of Defense, the intelligence community, federal law enforcement, and to other end-users, including internationally, who have mission critical needs where man power efficiency and data security and privacy are required.

8.      ProLogic capabilities include information sharing, cyber security (with an emphasis on key management and distribution), cloud computing, content management, social media privacy products, and custom solutions development.

9.      ProLogic's intellectual property is among its most valued assets.

10.      ProLogic has extensive expertise in the development, modification, and servicing of Communication Security ("COMSEC"), Accounting, Reporting, and Distribution System ("CARDS") software.   In fact, ProLogic (Scytale) is the original developer of CARDS.  CARDS and other such tools are used to track and manage accountability and automate the business processes associated with all aspects of a COMSEC support organization and its end-users.  ProLogic currently provides and has provided such services to numerous federal entities.

11.      For example, ProLogic assisted the Department of State with the further development and modification of CARDS software, interface support, and related services pursuant to Prime Contract No. SAQMMA10F2322, which was awarded to ProLogic in 2010 and included four one-year option periods through June 30, 2015.  ProLogic (Scytale) has been the incumbent contractor for a significant period of time and also had the predecessor contract with the Department of State.

12.     Working as a subcontractor, Aquarian, through principal James Kylis, provided ProLogic with consulting services in support of the ProLogic Prime Contract No. SAQMMA10F2322, beginning on July 1, 2010.  Kylis also worked with ProLogic (Scytale) on the predecessor contract.  In fact, Kylis's relationship with ProLogic (Scytale) goes back over 6 years.

13.     Both Swingle and Bernard were trusted ProLogic employees who worked on the CARDS software program during their tenure at ProLogic.

14.     Swingle worked at ProLogic from April 6, 2009 through June 30, 2014. Swingle worked on the ProLogic Department of State contract for over three years.  Swingle was a software developer who wrote code for the CARDS systems as well as for Key Hold and Bridge UAS, two other ProLogic software products.

15.     Bernard worked at ProLogic from September 28, 2009 through June 30, 2014. Bernard was initially hired to work in IT, but then became an on-site Support Specialist to provide systems support on ProLogic contracts.  Bernard began working on the ProLogic Department of State contract on February 20, 2013.  Bernard dealt with customer issues and requests, troubleshooting, and rolling out new versions of products.  He also enabled PKI certifications on servers.

16.     Both Bernard and Swingle possessed unique skills sets related to software programming and services.  Bernard and Swingle, for example, knew the locations of functionality in the million lines of code enabling them to maintain or enhance the software quickly and efficiently.  Swingle, while on the job at ProLogic, developed CARDS updates for ProLogic.  Swingle had knowledge of ProLogic's software development processes and

software development environment.  Bernard became an expert at troubleshooting and implementing the CARDS interface at the Department of State.

17.     Both Swingle and Bernard regularly worked with Kylis and Aquarian, ProLogic's subcontractor.  Swingle worked mainly in the ProLogic Westminster, MD office and occasionally worked on-site at the Department of State.  Bernard worked mainly at the Department of State site on a daily basis with Kylis.

18.     Bernard and Swingle were trusted with highly confidential ProLogic information for the purposes of carrying out their job requirements.  The software code, which they were given access to, was maintained on separate servers that were not connected to the internet or intranet.

19.     Confidentiality was a condition of Bernard's and Swingle's employment.  They also maintained security clearances and were, at times, required to process classified information during the performance of ProLogic's government contracts.

20.     The ProLogic Employee Handbook states:  "All records and information relating to the Company and its customers are confidential, and employees must treat all such information accordingly."  (*Id.* at 6.)  "Additionally, the contents of the Company's records and information may not be disclosed to anyone, except where required for a business purpose.  Employees may not disclose any confidential information, either deliberately or inadvertently, to any unauthorized person inside or outside the Company."  (*Id.* at 7.)

21.     The Employee Handbook further provided that:  "You may not use e-mail, voice mail, or the Internet to disclose confidential or proprietary information about or belonging to the Company, or for any other purpose that is illegal, against company policy, or contrary to the Company's interests."  (*Id.* at 31.)

22.     The Employee Handbook section on "work product" states:  "The Company retains legal ownership of all work product.  No work product that is created while employed at the Company can be claimed, construed, or presented as the property of an individual, even after the employment relationship ends.  This includes, but is not limited to, electronic documents, audio and video recordings, system code, and all concepts, ideas, or other intellectual property developed for the Company, regardless of whether it is actually used by the Company."  (*Id.* at 32.)

23.     The Standards of Conduct in the Employee Handbook include the following as prohibited conduct:

- "Theft, misappropriation, or unauthorized possession, use, or removal of the Company property or the property of others; . . .

- Performing your job in a manner that may or does cause injury to a person or damage to property, machinery, equipment, supplies, or the business reputation of the Company or its customers;"

(*Id.* at 35.)

24.     All ProLogic employees, including Swingle and Bernard, were on notice of the Employee Handbook requirements, including the corporate policy for protection of intellectual property.

25.     Both Swingle's and Bernard's employment agreements specifically contemplated that these employees would be handling confidential, proprietary, and trade secret information and required them to hold it in the strictest confidence.

26.     Swingle executed a "ProLogic Employee Agreement" with ProLogic on January 16, 2012 ("Swingle's Employment Agreement").  Bernard executed a "Confidentiality and Work Product Ownership Agreement" ("Bernard's Employment Agreement") with Scytale on September 30, 2009.

27.     Bernard's Employment Agreement, for example, stated in paragraph 1 that:

"You [Bernard] acknowledge that in the course of your work with Scytale you may receive, learn of, prepare, possess or control data, materials, records, reports, statements, studies, and other information in written, electronic, oral, visual, and other forms describing or otherwise pertaining to Scytale's financial performance, operations, clients, marketing and strategic plans, trade secrets, trade secrets, and other confidential information ("Confidential Information").

You agree that this Agreement provides reasonable protection for Scytale's reasonable business interests, and that this Agreement binds you whether you are an employee, and independent contractor or working for Scytale under another arrangement."

28.     Bernard's Employment Agreement further provides in paragraph 2 that:

"You [Bernard] agree that all of the Confidential Information is Scytale's sole and exclusive property and that you will have no rights in the Confidential Information unless expressly agreed to by Scytale in writing.  You must hold in strict confidence and not disclose, directly or indirectly, any or the Confidential Information whether or not considered trade secrets or otherwise confidential, to any person unless expressly authorized in writing."

29.     Bernard's Employment Agreement also required Bernard to return confidential information.  Paragraph 3 states that:  "You [Bernard] agree that upon the earlier to occur of either (a) the termination of our engagement with Scytale, or (b) Scytale's written notice to you, then you will promptly deliver to Scytale all Confidential Information that is in written, printed, or tangible form, and you will destroy and not retain any copy, however stored or embodied, of any of the Confidential Information for any purpose."

30.     The obligations in Bernard's Employment Agreement survive the termination of employment for a period of two years.  (Paragraph 8.)

31.     In his Employment Agreement, Swingle also agreed to keep ProLogic confidential, proprietary, and trade secret information confidential.  (See Paragraph 1.)

32.     The confidentiality requirements in the Swingle Employment Agreement remain binding for at least one year after termination.  (See Paragraph 1.e.)

33.     Swingle's Employment Agreement also contained a valid and enforceable non-compete clause.  (See Paragraph 2.)

34.     Swingle's non-compete required that:  "During the term of Employee's employment and for one year following Employee leaving employment, whether voluntary or non-voluntary, Employee agrees NOT to: (a)(i) provide or attempt to provide (or advise others of the opportunity to provide), directly or indirectly, any services to any client to which Employee has been introduced or about which Employee has received information through ProLogic or through any client for which Employee has performed services or to which Employee while employed."  (*Id.*)

35.     Accordingly, Swingle could not work, directly or indirectly, with the Department of State for one year.

36.     Bernard and Swingle, however, began to violate their employment agreements even while they were still working at ProLogic.

37.     Bernard routinely funneled ProLogic confidential, proprietary, and trade secret information to James Kylis and Aquarian while he was still employed at ProLogic.

38.     Email records demonstrate that Bernard was using his ProLogic email account to forward ProLogic highly confidential, proprietary, and trade secret information to James Kylis.

39.     On information and belief, Bernard provided Kylis with numerous other confidential, proprietary, and trade secret documents from ProLogic.

40.     The confidential, proprietary, and trade secret information was not relevant to or necessary for James Kylis's work under Aquarian's subcontract with ProLogic.  The information, however, would help Aquarian compete against ProLogic in the marketplace.

41.     Bernard also forwarded ProLogic confidential, proprietary, and trade secret information to Courtney Walker, the Program Manager at the Department of State on the ProLogic Department of State contract.  Such communications regarding ProLogic's internal business processes were not necessary to complete the contract work for the Department of State and would not be provided to a program manager even during the conduct of a government audit.

42.     Bernard acted with intent to help Kylis take work away from ProLogic and otherwise erode ProLogic's relationship with the Government, its major customer.  Specifically, Bernard, while engaged at ProLogic, was secretly helping Aquarian misappropriate the ProLogic Department of State CARDS contract.  Bernard committed these acts on ProLogic company time and while he was subject to a confidentiality and non-disclosure agreement.

43.     On information and belief, Bernard provided Kylis and Aquarian with ProLogic job descriptions, contract background and proprietary rate information, and other technical and pricing information, which Aquarian then used to bid on a new CARDS contract with the Department of State.

44.     In addition to illegally using ProLogic's employees to obtain information, on information and belief, Aquarian also used Bernard and Swingle to satisfy the past

performance requirement, which was critical to the success of Aquarian's bid for the Department of State CARDS contract.

45.     On information and belief, Aquarian used Bernard and Swingle as evidence of past performance at a time when Swingle and Bernard had not yet been hired by Aquarian and were still working for ProLogic.  Specifically, on information and belief, it misrepresented to the Government Swingle's and Bernard's employment status.  On information and belief, without using current ProLogic employees, Aquarian did not have a sufficient record of past performance to get a Department of State contract and absent this misrepresentation would not have been eligible for contract award.

46.     On July 1, 2013, the Department of State exercised an over $1 million one-year option under the existing contract to provide further development and support of the CARDS software.  In addition, one option year on the ProLogic Department of State contract remained for the period 2014 to 2015.  But the Department of State did not award the next one year option to ProLogic; it gave the work to Aquarian instead after Aquarian raided ProLogic's trade secret, proprietary, and confidential information and employees.

47.     On information and belief, Swingle, Bernard, and Aquarian made defamatory statements about ProLogic and the CARDS software to Courtney Walker, Denise Mason, and other Department of State employees in order to put Aquarian in a more positive position necessary to receive a contract from the Department of State.

48.     Aquarian knew it could not perform a contract for the Department of State without know-how and other trade secrets known by Swingle and Bernard and misappropriated from ProLogic, or without a copy of the CARDS source code versions used for the Department of State.  On information and belief, Aquarian, Bernard, and Swingle decided to illegally

remove the source code and software development environment from ProLogic's Westminster, MD office so they would have it to perform the work under the contract awarded to Aquarian. Swingle moved the code just shortly before he left ProLogic and while he was already making plans to work for Aquarian in the near future.  Without this information and environment, Aquarian would have been incapable of performing the requirements of its contract.

49.     Contrary to ProLogic company policy, Swingle took highly confidential and valuable CARDS software code and ProLogic's software development environment out of the ProLogic Westminster, MD office.  Swingle brought it to the Department of State to work on software developments on-site at Department of State even though he knew such work should be completed in ProLogic work space and despite knowing that his Employment Agreement strictly prohibited the removal of source code from the ProLogic premises.  Swingle was reprimanded for this action when it came to the attention of ProLogic, and he departed ProLogic shortly thereafter.  ProLogic required the development work to be conducted in Westminster in order to protect its trade secrets.  The Department of State statement of work also required that most contract work should be conducted at contractor facilities except for the support services performed by Kylis.

50.     Swingle failed to return the source code to ProLogic before he left ProLogic.

51.     The loss of the Department of State option contract was a direct result of Aquarian, Bernard, and Swingle's wrongful actions.  As the incumbent contractor and original software developer, ProLogic was in a unique position to obtain further work from the Department of State but for the Defendants' conduct.  ProLogic had no past performance issues.  As the developer of the CARDS software and long-term incumbent, ProLogic had more experience and expertise than Aquarian.  The Department of State had funding available

to continue performance and an ongoing requirement, as demonstrated by its contract award to Aquarian.  But for Aquarian's illegal misappropriation, ProLogic's contract option would have been exercised.

52.     Swingle and Bernard had every intention to leave ProLogic.  Once it became clear to Swingle and Bernard that Aquarian was the apparent awardee for the CARDS contract work from the Department of State, Swingle and Bernard prepared to leave ProLogic for Aquarian.  After leaving, Swingle and Bernard immediately began doing the exact same work for the Department of State that they had worked on at ProLogic.

53.     Prior to his separation from ProLogic, Bernard told his ProLogic supervisor, Rebecca Guzman, that the new company he was going to work for (not identified by Bernard at that time) would not be able to perform its new Department of State CARDS contract without his participation.

54.     Swingle's work for Aquarian on a Department of State CARDS contract is in direct violation of his non-compete agreement with ProLogic.  His non-compete specifically prohibited him from working, directly or indirectly, for the same clients he worked on at ProLogic for a period of one year.

55.     ProLogic sent cease and desist letters to Swingle and Bernard on August 8, 2014.  Swingle and Bernard both failed to respond.

56.     On information and belief, Aquarian is in the process of inappropriately soliciting additional ProLogic employees to go work at Aquarian in violation of their ProLogic employment agreements.

57.     As a result of Bernard, Swingle, and Aquarian's wrongful acts, ProLogic has lost multiple millions of dollars.  ProLogic also stands to lose millions more if Aquarian,

Bernard, and Swingle use confidential information and trade secrets from ProLogic to take additional contracts away from ProLogic.

58.     Accordingly, ProLogic asserts the following causes of action.

## Causes of Action

### Count One
### Breach of Duty of Loyalty (Bernard and Swingle)

59.     The foregoing paragraphs are incorporated as if fully set forth herein.

60.     As employees of ProLogic, Bernard and Swingle had fiduciary duties to their employer ProLogic.  Bernard and Swingle were trusted with trade secret, confidential, and/or proprietary information.

61.     Bernard breached his duty of loyalty to ProLogic by providing James Kylis, Aquarian, and the U.S. Government with ProLogic trade secret, proprietary, and/or confidential information on numerous occasions.

62.     Moreover, Swingle and Bernard began plotting their departure to Aquarian to work on the Department of State contract well before their actual departure from ProLogic.

63.     Swingle and Bernard began soliciting ProLogic's clients while they were still working at ProLogic.

64.     Swingle and Bernard committed wrongful acts in preparing to compete with ProLogic in the future.  They moved to undercut ProLogic's current contracts and fed confidential information to competitor and future employer Aquarian.

65.     ProLogic's customer relationships have been jeopardized by Bernard's and Swingle's conduct in breach of their duty of loyalty.

66.     Bernard and Swingle have caused damage to ProLogic by providing these private corporate details and proprietary and trade secret information to competitors and

customers.  The release of the information in breach of the duty of loyalty will continue to harm ProLogic in the future.

67.     ProLogic is entitled to punitive damages because Bernard and Swingle acted with actual malice in breaching their duties of loyalty.

## Count Two
## Breach of Contract (Swingle)

68.     The foregoing paragraphs are incorporated as if fully set forth herein.

69.     Swingle breached his Employment Agreement.

70.     Swingle breached the non-compete requirement of his Employment Agreement. It provides that Swingle cannot work for ProLogic clients that Swingle worked with during his employment at ProLogic for a period of one year after his departure.

71.     While at ProLogic, Swingle worked for ProLogic customers, including the Department of State and other agencies.

72.     Swingle breached his Employment Agreement by helping Aquarian get the Department of State contract and by directly working on a Department of State contract within days of leaving ProLogic.

73.     On information and belief, Swingle further breached his Employment Agreement by feeding confidential, proprietary, and/or trade secret information to James Kylis, Aquarian, and the U.S. Government.

74.     ProLogic has been damaged by Swingle's breaches of his Employment Agreement, including but not limited to, because it lost the Department of State CARDS contract.  ProLogic seeks an injunction to enforce the Employment Agreement.

75.     ProLogic is also entitled to attorney's fees and reasonable costs of litigation due to having to enforce Swingle's Employment Agreement.  (See Paragraph 8.c.)

## Count Three
## <u>Breach of Contract (Bernard)</u>

76.     The foregoing paragraphs are incorporated as if fully set forth herein.

77.     Bernard breached his Employment Agreement.

78.     Bernard's Employment Agreement continues to be enforceable against Bernard because Paragraph 8 dictates that the obligations remain binding for two years after termination (i.e., two years after June 30, 2014 when Bernard left ProLogic).

79.     Bernard's Employment Agreement explained that Bernard would be trusted with the company's most secret information.

80.     Bernard breached Paragraphs 1 and 2 of the Bernard Employment Agreement.

81.     Bernard breached those provisions by disclosing confidential information in violation of his Employment Agreement.  Bernard routinely provided confidential information orally, by email, and by other means to James Kylis, principal for Aquarian, and to Courtney Walker, the Program Manager at the Department of State.

82.     Bernard never obtained any express permission from ProLogic to make such disclosures.

83.     On information and belief, Bernard also breached Paragraph 3 ("Return of Confidential Information") of his Employment Agreement which requires return of all confidential information following termination of employment.

84.     ProLogic has been damaged by Bernard's breaches of his Employment Agreement, including but not limited to, because, as a direct result of Bernard's breaches, it lost the Department of State CARDS work, and because ProLogic's confidential business information now is in the hands of Aquarian, the U.S. Government, and unknown third parties.

85.     Bernard also has helped and is helping Aquarian usurp ProLogic's business by misappropriating ProLogic's confidential, proprietary, and trade secret information.  ProLogic has been damaged by these breaches.

86.     In signing his Employment Agreement, Bernard agreed that "any breach of this Agreement by you [Bernard] will cause immediate, substantial and irreparable harm and damage to Scytale for which money damages will not be a sufficient remedy."  Accordingly, Bernard agreed Scytale (now ProLogic) would be entitled to an injunction to enforce its rights.

87.     Pursuant to Paragraph 7 of Bernard's Employment Agreement, ProLogic is entitled to injunctive relief and reasonable costs of litigation, including attorney's fees, incurred in enforcing this Agreement.

**Count Four**
**Tortious Interference with Prospective Business Advantage**
**(Aquarian, Bernard, Swingle)**

88.     The foregoing paragraphs are incorporated as if fully set forth herein.

89.     Bernard and Swingle acted outside the scope of their employment with ProLogic in nefariously helping Aquarian usurp contracts from ProLogic.

90.     Bernard and Swingle inappropriately disclosed sensitive, confidential information outside of ProLogic.

91.     Bernard was routinely, and without permission, forwarding ProLogic executive staff meeting notes, which included highly sensitive marketing plans, business capture strategy documents, customer lists, internal company information, business plans, ProLogic's strategic roadmap, and other confidential and proprietary and competition-sensitive information to Kylis at Aquarian.

92.     Aquarian used improper means to interfere with ProLogic's prospective business advantage, such as by providing fraudulent information and misrepresenting its status

in its proposal to win the Department of State contract.  On information and belief, Aquarian used Swingle's and Bernard's experience in order to establish the requisite past performance necessary to win a government contract, even though Aquarian had not yet hired Swingle and Bernard.  On information and belief, Aquarian used ProLogic's past performance record to fraudulently establish its own past performance for purposes of winning the Department of State contract and to take the work away from ProLogic.  Without this past performance, Aquarian would not have been able to qualify for award of the contract.

93.     On information and belief, Bernard and Swingle are helping Aquarian interfere with ProLogic's many other contracts that are up for renewal or in the process of being completed.

94.     Judicial action is needed to protect ProLogic's business from further damage.

95.     In addition to actual damages and injunctive relief, ProLogic is entitled to punitive damages because Defendants acted with actual malice.  Defendants acted not only in self-interest but with intent to take away ProLogic's CARDS business and harm ProLogic.

**Count Five**
**Misappropriation of Trade Secrets**
**(Maryland Uniform Trade Secrets Act,**
**Md. Code Ann., Com. Law § 11-1201, et al.)**
**(Aquarian, Bernard, Swingle)**

96.     The foregoing paragraphs are incorporated as if fully set forth herein.

97.     Bernard misappropriated ProLogic's trade secrets by disclosing, among other things, customer lists, executive staff meeting minutes, customer information, business strategy plans, business capture plans, ProLogic's strategic roadmap and other confidential and proprietary information to Aquarian.

98.     On information and belief, Swingle also misappropriated ProLogic's trade secrets by disclosing, among other things, customer lists, executive staff meeting minutes,

customer information, business strategy plans, and other competition-sensitive information to Aquarian.

99.    Swingle further misappropriated ProLogic's trade secrets by removing from ProLogic's offices proprietary source code and ProLogic's software development environment and taking it to a customer site, against company policy.  Swingle then improperly used ProLogic's trade secrets by creating a software development environment at the customer site and loaded source code onto that environment, again, against company policy.   On information and belief, Swingle did this for the benefit of Aquarian while employed with ProLogic.

100.    Bernard and Swingle also misappropriated ProLogic trade secrets by using ProLogic's CARDS software trade secrets to perform work for Aquarian, including but not limited to, ProLogic's software development environment, software development processes, ProLogic's general technical know-how and processes specific to its software development and support, and specifically,  ProLogic's technical know-how and processes relating to its CARDS development.

101.    Aquarian misappropriated ProLogic's trade secrets by accepting such secrets from Bernard and Swingle knowing they were procured improperly and by using these secrets to take the Department of State contract away from ProLogic.

102.    On information and belief, Aquarian also encouraged Bernard and Swingle to misappropriate ProLogic's trade secrets and to breach their duties of confidentiality in order to position Aquarian to interfere with and ultimately purloin ProLogic's Government business.

103.    Bernard, Swingle, and Aquarian all learned about the ProLogic trade secrets while in confidential relationships with ProLogic.

104.    ProLogic did not give permission to Bernard, Swingle, or Aquarian to use or disclose ProLogic trade secrets outside the course of their employment.

105.    Bernard, Swingle, and Aquarian improperly took, disclosed, and used the trade secrets without any right or privilege to do so.

106.    ProLogic's misappropriated trade secrets are extremely valuable to ProLogic and cannot be recreated from publicly available sources.  ProLogic, and its predecessor Scytale, spent years creating these proprietary processes, know-how, business strategies, and customer relationships.

107.    ProLogic took extensive steps to protect its trade secrets.  ProLogic (and its predecessor) had all employees sign confidentiality agreements and had policies in place to prohibit employees from removing source code and software development environments from ProLogic's premises.  ProLogic's Employee Handbook also extensively reviewed and provided confidentiality requirements for employment at ProLogic.  ProLogic provided information about these trade secrets on a "need to know" basis.  Only ProLogic's software developers with a verified Secret or above clearance were granted access to the source code and software development environments, which also included ProLogic's technical know-how and processes generally, and as specifically related to CARDS.  ProLogic maintained a separate network, disconnected from ProLogic's intranet and the Internet, for this information in order to ensure that the protection of the source code and software environment could not be breached.

108.    ProLogic has been harmed by this misappropriation, and is entitled to damages. ProLogic is entitled to actual and punitive damages because Bernard, Swingle, and Aquarian acted with intent to harm ProLogic, as evidenced by email traffic showing collusion amongst Bernard, Swingle, and Aquarian and their actions immediately prior to the award of the

Department of State contract to Aquarian.  The acts were brazen given they were conducted in part on ProLogic email accounts.

109.    Unless Defendants are enjoined by the Court, Defendants will continue to misappropriate ProLogic's trade secrets and thereby harm ProLogic.  The Court should enjoin Aquarian, Bernard, and Swingle from further misappropriating ProLogic's trade secrets.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Award ProLogic $25 million (or an amount to be determined at the time of trial) in actual damages as well as consequential and punitive damages in an amount to be determined at the time of trial;

2.    Enforce Bernard's Employment Agreement and enjoin Bernard from violating it;

3.    Enforce Swingle's Employment Agreement and enjoin Swingle from violating the confidentiality provisions as well as his non-compete agreement for a period of one year and an additional equitable period as determined by this Court, including but not limited to an injunction barring Swingle from working directly or indirectly on CARDS software projects for a period of one year and the additional equitable period determined by this Court;

4.    Enjoin Bernard and Swingle from using, disclosing, or keeping ProLogic confidential, proprietary, and trade secret information;

5.    Order Bernard and Swingle to return all ProLogic confidential, proprietary, and trade secret information received from and provide third-party verification they no longer possesses such information;

6.    Enjoin Aquarian from employing Bernard and Swingle to work on Department of State CARDS software contracts or any other contract related to CARDS software;

7.    Enjoin Aquarian, Bernard, and Swingle from inducing other ProLogic employees to leave ProLogic for Aquarian;

8.    Enjoin Aquarian from continuing to use ProLogic's confidential, proprietary, and trade secret information;

9.    Order Aquarian to return all confidential information received from Bernard and Swingle and provide third-party verification that Aquarian no longer possesses such information on any Aquarian electronic device;

10.   Award ProLogic attorney's fees and other reasonable costs of litigation; and

11.   Order such other relief as this Court deems just and proper.

Dated:  September 12, 2014                        Respectfully Submitted,


/s/
Christina M. Carroll, MD State Bar No. 16863
Jessica C. Abrahams, *pro hac vice admission pending*
McKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, D.C. 20006
Tel:  202.496.7500
ccarroll@mckennalong.com
jabrahams@mckennalong.com

*Attorneys for Plaintiff ProLogic, Inc.*